Jesse B. WRIGHT, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A04–0108–CR–341.

Court of Appeals of Indiana.

July 11, 2002.

Sharon L. Wright, Frankton, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Jesse Wright appeals his conviction for public intoxication, a Class B misdemeanor. We affirm.

## Issues

Wright raises five issues for our review, which we restate as:

I. whether a hotel hallway constitutes a "public place" for purposes of the public intoxication statute, Indiana Code Section 7.1–5–1–3;

II. whether Indiana Code Section 7.1–5–1–3 is unconstitutional on its face;

III. whether Indiana Code Section 36–8–10–10.6, which authorizes a private person employed by a private employer to have government arrest powers, is unconstitutional;

IV. whether the evidence was sufficient to support the conviction; and

V. whether he was denied his right of appeal under the Indiana Constitution.

## Facts[1]

■ At approximately 3:30 a.m. on January 21, 2001, Wright and Roy Kelly en-

---

1. The Statement of the Case in the Appellant's Brief contains not only a recitation of the procedural posture of this case, but also comments such as the following:

 Attorney Andrea Marsh [counsel for the hotel], of Ice Miller, was also present throughout the entire trial, and assisted the Prosecutor by, for instance assuring Raylene Hardin [night clerk] was present to testify for the State, and was seen speaking to the State's witnesses during recess. Attorney Daniel Whitehead had withdrawn due to a conflict of interest created by discussions with the Prosecutor and Hotel representatives related to the civil lawsuit by his clients, the evicted Hotel guests. Therefore, at trial the attorneys were three for the State, one for defendant.

 Appellant's Brief p. 3 n. 1. Such editorializing runs contrary to the purpose of having a section of the brief devoted strictly to the procedural posture. The Statement of the Facts does not comply with Appellate Rule 46(A)(6)(c), which provides that the "statement shall be in narrative form and shall not be a witness by witness summary of the testimony." It also does not comply with Rule 46(A)(6)(b), which compels that facts "be stated in accordance with the standard of review appropriate to the judgment or order being appealed." The facts are not presented in the light most favorable to the judgment. Finally, we note the general offensive and inflammatory tone to the brief. One such comment is:

 The [public intoxication] statute is mainly a tool for racism, used by the police, prosecutors and courts, to punish poor people with jail, fines, and fees, which force generation after generation of Blacks, Hispanics, and children without fathers to live in poverty, impoverished by the State to create political patronage jobs. And so the [sic] Indiana's bright beginning as a land where every person is free, has been corrupted by the descendents of the Southern slaveholders who see in the Constitutional exception to slavery—persons convicted of crime—nothing immoral, unethical, or illegal in treating criminals as slaves. Any protest is considered the vilest sedition—speaking the truth against the King.

 Appellant's Brief p. 20. Such comments do little to advance Wright's position as to why the trial court committed reversible error or why he was not guilty of being intoxicated in a public place and, therefore, do not promote responsible advocacy on his behalf. "For the use of impertinent, intemperate, scandalous, or vituperative language in briefs on appeal impugning or disparaging this court, the trial court, or opposing counsel, we have the plenary power to order a brief stricken from our files and to affirm the trial court without further ado." *Clark v. Clark,* 578 N.E.2d 747, 748 (Ind.Ct.App.1991) (relenting from striking the entire brief out of concern for unduly punishing the offending attorney's client); *see also WorldCom Network Servs., Inc. v. Thompson,* 698 N.E.2d 1233, 1237 (Ind.Ct.App.1998) ("[T]he offensive material is so interwoven with legitimate argument that we have considered striking the entire submission. We have chosen instead to strike only the inappropriate portions of the Thompsons' petition and brief because we do not believe the Thompsons should be denied consideration of their appeal due to the excessive zeal of their attorneys."), *trans. denied.* In the interest of evaluating the merits of Wright's issues on appeal, we choose not to strike the briefs filed by his counsel or any portion thereof. How-

tered the Embassy Suites Hotel ("Hotel"). Wright asked for the room number of a guest named Melissa, who had rented a room on the tenth floor. Wright said that they knew her and that she was expecting them to stay in the room. Although Wright had a cardkey, the hotel clerk, Raylene Hardin, refused to give him the room number because he was not listed as a registered guest.

Wright told Hardin that he would just try the doors until he found the room and walked across the lobby toward the elevators. He was stopped by a security guard, Jeffrey Reynolds. Wright showed Reynolds his room key, and Reynolds took Wright back to the front desk because Wright could not remember Melissa's last name.

Wright became verbally abusive, and Reynolds informed him the police would be called for backup. After Reynolds called his employer, Premier Security, for assistance, two special deputies of the Marion County Sheriff's Department were dispatched to the scene. In the meantime, Wright and Kelly were detained in the lobby. The deputies, Rex Thompson and Paul Shepard, arrived, and Wright became verbally abusive toward Thompson. Thompson observed that Wright smelled of alcohol, had slow and slurred speech, and was unsteady on his feet.

The deputies escorted Wright and Kelly to Melissa's room and knocked several times on the door. The people in the room identified Wright and Kelly as their guests. Wright became more agitated and abusive when the deputies escorted all of the guests out of the room because they were not registered. Thompson arrested Wright for public intoxication.

ever, we admonish counsel to advocate more professionally in future matters before this

Prior to trial, Wright filed a motion to dismiss challenging the constitutionality of the public intoxication and special deputy statutes. After a jury trial, Wright was found guilty as charged.

### Analysis

### I. Public Place

Wright first argues that a guest or a guest-of-a-guest of a hotel who is in the hotel lobby or hallway is not in a public place or place of public access as required by Indiana Code Section 7.1-5-1-3, which provides that "[i]t is a Class B misdemeanor for a person to be in a public place or a place of public resort in a state of intoxication caused by the person's use of alcohol or a controlled substance...." Wright contends that because he was not in a public place at the time of his arrest, he did not commit the offense of public intoxication.

 Our standard of review for the interpretation of statutes is de novo. *Parkview Hospital, Inc. v. v. Roese,* 750 N.E.2d 384, 386 (Ind.Ct.App.2001), *trans. denied.* We review legal determinations to ascertain whether the trial court erred in application of the law. *Id.* When a statute is clear and unambiguous on its face, we may not interpret the statute. *Id.* Rather, words are to be given their plain, ordinary, and usual meaning unless a contrary purpose is clearly shown by the statute itself. *Id.*

The term "public place" is not defined by the public intoxication statute. However, some cases have offered definitions of the term. An early definition of "public place" is found in *State v. Tincher,* 21 Ind.App. 142, 51 N.E. 943, 944 (1898), which states, "A 'public place' does not mean a place devoted solely to the use of

court or face appropriate sanctions.

the public; but it means a place which is in point of fact public, as distinguished from private,—a place that is visited by many persons, and usually accessible to the neighboring public." Because a private residence is not "usually accessible to the neighboring public," the court reversed Tincher's conviction for being found intoxicated while attending a party at a private residence. *Id.*

The word "public" was further defined in *Peachey v. Boswell,* 240 Ind. 604, 167 N.E.2d 48, 56–57 (1960), in discussing the phrase, "[i]n any place accessible to the public" in the context of a gambling statute. Our supreme court stated:

> Webster defines "public" as "open to common and general use, participation, or enjoyment" of the public. It has been held that the term "public place" as used in statutes pertaining to gambling includes any place which for the time being is made public by the assemblage of people who go there with or without invitation and without restraint.
>
> A place may be accessible to the public for gambling notwithstanding that every person who desires is not permitted access thereto.
>
> It has also been held that in a case involving a prohibition law that by "public" is meant that the public is invited to come to the place and has access to it for the purpose within the scope of the business there maintained.
>
> "Accessible to the public" as used in the Act here in question has not been defined by either of the courts of appeal of this State, nor have we been able to find definition by the courts in other jurisdictions.
>
> From a consideration of the terms "accessible," "public", and "public place", as defined hereinabove, together with the purpose of the Act, we have concluded that the phrase "in any place accessible to the public" as used in § 10–2330, supra, means *any place where the public is invited and are free to go upon special or implied invitation a place available to all or a certain segment of the public.*

*Id.* at 57 (internal citations omitted) (emphasis added).

More recently, the definition has been reiterated as a place "visited by many persons, and usually accessible to the neighboring public." *Martin v. State,* 499 N.E.2d 273, 276 (Ind.Ct.App.1986). We have also deemed the term to include a place open to common and general use, participation and enjoyment; a place accessible to the public. *Price v. State,* 600 N.E.2d 103, 115 (Ind.Ct.App.1992), *aff'd in relevant part,* 622 N.E.2d 954 (Ind.1993). What constitutes a public place has been examined in several cases. *See, e.g., Heichelbech v. State,* 258 Ind. 334, 340, 281 N.E.2d 102, 106 (1972) (holding that a business establishment open to the public was a public place or place of public resort); *Miles v. State,* 247 Ind. 423, 424–25, 216 N.E.2d 847, 849 (Ind.1966) (finding person in the cab of a truck that was parked approximately a few feet from the traveled portion of the highway was in a public place for purposes of public intoxication statute); *Atkins v. State,* 451 N.E.2d 55, 56 (Ind.Ct.App.1983) (finding that passenger in a vehicle on a public highway was in a public place for purposes of public intoxication statute); *Bridgewater v. State,* 441 N.E.2d 688, 690 (Ind.Ct.App.1982) (holding that person who was found drunk in a bank parking lot at night was in a public place), *trans. denied; Cornell v. State,* 398 N.E.2d 1333, 1338 (Ind.Ct.App.1980) (holding that where a defendant was in a car parked on a private lane twenty to thirty feet from a public highway, he was not in a public place).

Wright analogizes the Hotel to an apartment building "where common areas are used to gain access to private areas, yet are not themselves public places of public resort." Appellant's Br. p. 14. In support of his argument, he relies upon *State v. Culp*, 433 N.E.2d 823 (Ind.Ct.App. 1982), *trans. denied*, 446 N.E.2d 969 (1983), where two men were arrested for public intoxication after being found drunk on a common stairway in an apartment house. We observed, "[u]nlike business enterprises, members of the public at large are not impliedly invited or encouraged to enter the common areas of an apartment house except when they have personal and private matters to conduct with the tenants." *Id.* at 824 (footnote omitted). Therefore, we found that the defendants were not in a public place and reversed their convictions. *Id.*

We agree that there are some similarities between common areas of an apartment complex and the hallways of a hotel. We believe, though, that there are critical distinctions. On the one hand, residents of an apartment complex are permanent to the extent that they have leases or month-to-month agreements with the landlords. The facilities are residential in nature and serve as the residents' homes during the duration of their terms, and the residents reasonably expect a certain degree of privacy in the areas immediately surrounding their apartments. On the other hand, hotel guests are more transient and seek more temporary housing. As a result, a hotel services numerous members of the public on a daily basis. Whereas residents of an apartment complex may become acquainted with their neighbors they frequently encounter in the common areas, the identities of those staying at a hotel is constantly changing. Because of this, hotel guests expect to enjoy little privacy outside their individual rooms and are aware that they may encounter many unfamiliar members of the public in the hallways and other common areas. Furthermore, invited visitors to apartment complexes are there for the sole purpose of visiting a resident. The general public is neither invited nor permitted to be there. Hotels, however, frequently solicit business from the public for purposes other than providing shelter, and often invite the public to use the dining, banquet, retail, or recreational facilities even without staying in the hotel. The escalators, elevators, and hallways are open to the public.

These distinctions lead us to the conclusion that the Hotel hallway was, in fact, a public place for purposes of the public intoxication statute. As we stated long ago in *Tincher*, 21 Ind.App. 142, 51 N.E. at 944, "A 'public place' does not mean a place devoted solely to the use of the public; but it means a place which is in point of fact public, as distinguished from private,—a place that is visited by many persons, and usually accessible to the neighboring public." *See also Martin*, 499 N.E.2d at 276. The Hotel hallway is certainly visited by many people and is accessible to the public. The spirit of the public intoxication statute is to prevent people from becoming inebriated and then bothering and/or threatening the safety of other people in public places. Our supreme court has stated, "The purpose of the law is to protect the public from the annoyances and deleterious effects which may and do occur because of the presence of persons who are in an intoxicated condition." *State v. Sevier*, 117 Ind. 338, 340, 20 N.E. 245, 246–47 (1889). It is logical to us that the scenario presented today, namely an intoxicated person causing a disturbance in a hotel hallway in the middle of the night, is precisely the genre of behavior sought to be criminalized by this statute. Therefore, we hold that the Hotel

hallway was a "public place" for purposes of the public intoxication statute.

## II. Public Intoxication Statute

■ Wright claims that the public intoxication statute is unconstitutional in that it is:

vague and over broad on its face, fails to give adequate notice of what is forbidden and what is permitted, unconstitutionally reaches a broad range of innocent conduct, and does not provide adequate notice of the proscribed conduct; and does not set minimal guidelines for law enforcement, but rather give [sic] officers absolute discretion to determine what constitutes public intoxication, without standards to guard against arbitrary deprivation of liberty.

Appellant's Br. p. 16. Whether a statute is unconstitutional on its face is a question of law. *State v. Rans,* 739 N.E.2d 164, 166 (Ind.Ct.App.2000), *trans. denied.* Where an issue on appeal is a pure question of law, the matter is reviewed de novo. *Id.* When the validity of a statute is challenged, we begin with a presumption of constitutionality. *State v. Lombardo,* 738 N.E.2d 653, 655–56 (Ind.2000). The burden to rebut this presumption is upon the challenger, and all reasonable doubts must be resolved in favor of the statute's constitutionality. *Id.*

■ A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it adequately to inform them of the proscribed conduct. *Id.* The statute need only inform the individual of the generally proscribed conduct and need not list with exactitude each item of prohibited conduct. *Id.* Finally, it is well established that vagueness challenges to statutes that do not involve First Amendment freedoms must be examined in light of the facts of the case at hand. *Id.*

■ The gist of Wright's challenge to the statute is that it does not differentiate between "legal" intoxication and "illegal" intoxication, thereby giving no guidance to law enforcement officials as to when arrests are appropriate. He opines, "On its face, the statute makes criminal all intoxication from the first sip to death by alcohol-poisoning, including that which occurs every day as thousands of people drink legally at public drinking establishments and in their homes, in Indianapolis and all over Indiana." Reply Br. pp. 8–9.

■ Despite the fact that the public intoxication statute does not provide a specific definition of intoxication, we do not agree with Wright's pronouncement that the statute is unconstitutionally vague. The statute does adequately advise the public of the proscribed conduct, namely appearing in a public place in an intoxicated state. Furthermore, in *Atkins v. State,* 451 N.E.2d 55, 57 (Ind.Ct.App.1983), we stated:

We are cognizant of the case law holding intoxicated passengers in private vehicles are not "in a public place" within the meaning of public intoxication statutes as expressed in *Brown v. State,* (1955) Ala., 38 Ala.App. 312, 82 So.2d 806, and *Atkins v. City of Tarrant City,* (1979) Ala.Cr.App., 369 So.2d 322. However, in Indiana, the legislature's silence evidences its acquiescence in the existing judicial interpretation of our public intoxication statute. The only change in this statute since *Miles v. State,* (1966) 247 Ind. 423, 216 N.E.2d 847, was in 1978 when the penalty was changed, making violation a class B misdemeanor.

Therefore, the judicial interpretation of our public intoxication statute is probative. We are not persuaded by Wright's attempts to produce an absurd result by

arguing that a patron who has one sip of alcohol in a dining establishment would be guilty under the statute. It is axiomatic that one sip, or even a few sips, of alcohol would not render an ordinary person "intoxicated" for purposes of the public intoxication statute.

Furthermore, the statute is not unconstitutionally vague or overbroad as applied in this case. Thompson testified that Wright was verbally abusive and uncooperative. He stated that Wright had red eyes, had slow and slurred speech, smelled strongly of alcohol, and was unsteady on his feet. Thompson further testified that after he took Wright to the tenth floor, Thompson became fearful of being thrown over the railing. Thompson testified that based on these observations, he believed Wright was intoxicated. These observations are similar to those made in other cases where Indiana courts have upheld public intoxication convictions. *See, e.g., Gamble v. State*, 591 N.E.2d 142, 143 (Ind.Ct.App.1992) (involving a defendant who was loud and boisterous and fought with police when they arrived); *Atkins v. State*, 451 N.E.2d 55, 57 (Ind.Ct. App.1983) (involving a defendant who was unsteady on her feet, and had an alcoholic odor about her breath and person). Although Wright claims that his arrest was because of his bad attitude and was in response to his exercise of his right to protest police action, we are not convinced that his arrest and subsequent conviction were the result of an unconstitutional application of the statute. The special deputies were well within their authority to arrest Wright based on their observations, and the evidence clearly supports the conviction. It is not dispositive that Thompson arrested Wright after Wright called Thompson names. Wright's disrespect for and offensive tirade toward the deputies was merely one indicator of intoxication supporting his arrest and conviction. We thus conclude that the statute on its face and as applied in this case is not unconstitutional.

### III. Special Deputy Statute

Indiana Code Section 36–8–10–10.6(a) provides:

> The sheriff may appoint as a special deputy any person who is employed by a governmental entity as defined in IC 35–41–1 or private employer, the nature of which employment necessitates that the person have the powers of a law enforcement officer. During the term of his appointment and while he is fulfilling the specific responsibilities for which the appointment is made, a special deputy has the powers, privileges, and duties of a county police officer under this chapter, subject to any written limitations and specific requirements imposed by the sheriff and signed by the special deputy. A special deputy is subject to the direction of the sheriff and shall obey the rules and orders of the department. A special deputy may be removed by the sheriff at any time, without notice and without assigning any cause.

Wright claims this statute is unconstitutional "in that it permits a private person employed by a private employer to have government arrest powers over other private citizens, for the private benefit of private business, which is a pernicious form of slavery." Appellant's Br. p. 20. He further claims:

> The Indiana Attorney General has given an opinion that special deputies under I.C. § 36–8–10–10.6 are at-will employees and not merit employees. Marion County Sheriff Jack Cottey has a web site stating unequivocally that all special deputies are political appointees. In operation, this means that the Republican Party holds the special deputy jobs in

their cache of political patronage positions, but if a candidate from the Democratic Party wins the office of Marion County Sheriff in the next election, the Democrats will own those political patronage jobs until unseated by a Republican candidate. Both political parties win, and Indiana residents lose. Nevertheless, political expediency does not make the "privatization" of the Sheriff's Department by the Indiana Legislature constitutional under the U.S. Constitution, nor the Indiana Constitution.

Appellant's Br. p. 23 (citation to attorney general opinion omitted).

The basis for Wright's challenge to the special deputy statute is not clear and is unsupported by authority. The only cogent claims we glean from his brief are that he was unlawfully detained by Hardin and Reynolds and that the eviction of the group from the room was unlawful because there was no warrant. Neither claim has merit.

■ First, we are not persuaded that Wright was unlawfully detained. Hardin and Reynolds did not simply detain Wright as he walked through the hotel. Wright approached the front desk in the middle of the night and asked for the room number of a woman he claimed to be sharing a room with but could not remember her last name. The security guards did not become involved until Wright announced he was going up to the tenth floor to knock on all the doors until he found his friend. Clearly, the guards were within their authority to prevent Wright from disrupting the hotel guests in the middle of the night. It was only upon Wright's arguing with the security guards that further assistance was sought. Thompson acted within his statutory authority as a special deputy because he had probable cause to arrest Wright for public intoxication based on the evidence we previously recounted.

■ Second, to the extent Wright challenges the eviction, his argument is beyond the scope of the issues before us today. Wright's arrest was not precipitated by the eviction because he was not in the room at the time of the arrest. Rather, his arrest was based on his behavior in the public areas of the hotel. As a result, the propriety of the eviction is irrelevant.

### IV. Sufficiency of the Evidence

■ To prove Wright was guilty of public intoxication, the State was required to prove that he was in a public place or place of public resort in a state of intoxication. *See* Ind.Code § 7.1–5–1–3. The trial court instructed the jury that " '[i]ntoxicated' means under the influence of alcohol, such that there is an impaired condition of thought and action to such a marked degree that the intoxicated person has a significant loss of normal physical and mental faculties." [2] Appendix p. 244. Wright contends the evidence presented at trial did not establish that he was in an impaired condition. Specifically, Wright claims the evidence merely established that he had smelled of alcohol and that he was verbally abusive to the security guards and special deputies.

His brief, however, contains no acknowledgment of our narrow standard of review when considering the sufficiency of the evidence. Indiana Appellate Rule 46(A)(8)(b) states that an appellant's brief

---

**2.** Wright proposed a different instruction on intoxication, but the trial court refused it. He claims that the refusal was erroneous. However, he fails to provide a coherent argument challenging the denial and fails to cite authority in support of his claim. Therefore, he has waived review of it. *See* Ind. Appellate Rule 46A(8)(a); *Diaz v. State,* 753 N.E.2d 724, 730 n. 4 (Ind.Ct.App.2001), *trans. denied.*

"must include for each issue a concise statement of the applicable standard of review." We conclude that this failure to cite the appropriate authority constitutes waiver of this argument. *See Johnson v. State,* 693 N.E.2d 941, 954 (Ind.1998); *Jackson v. State,* 758 N.E.2d 1030, 1037 (Ind.Ct.App.2001).

Waiver notwithstanding, we are convinced that the evidence in this case is more than sufficient to support Wright's conviction. In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment, and neither reweighing the evidence nor assessing the credibility of the witnesses, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Winn v. State,* 748 N.E.2d 352, 357 (Ind.2001). With respect to the sufficiency of the evidence upon the element of intoxication, it is established that a non-expert witness may offer an opinion upon intoxication, and a conviction may be sustained upon the sole testimony of the arresting officer. *Price,* 600 N.E.2d at 116.

The evidence at trial established that Wright was verbally abusive to the special deputies, had red eyes, smelled strongly of alcohol, and was unsteady on his feet. Based on these observations, Thompson testified he believed Wright to be intoxicated. Thompson further testified that he began to be concerned about the balcony railing and started to feel like he was losing control of the situation as Wright became more agitated. This evidence is sufficient to establish that Wright was impaired. The conviction is supported by the evidence.

### V. Right to Appeal

Finally, Wright contends that he was deprived of his constitutional right to appeal. The Indiana Constitution provides:

> Court shall have no original jurisdiction, except that it may be authorized by rules of the Supreme Court to review directly decisions of administrative agencies. In all other cases, it shall exercise appellate jurisdiction under such terms and conditions as the Supreme Court shall specify by rules which shall, however, provide in all cases an absolute right to one appeal and to the extent provided by rule, review and revision of sentences for defendants in all criminal cases.

Ind. Const. Art. 7, § 6. Wright contends his right to appeal was infringed upon because the court reporter did not include certain portions of the trial when she prepared the transcript, namely voir dire, the opening and closing statements, and final statement to the jury. He claims that the constitutional rights of criminal defendants have been impaired:

> and to some extent extinguished by the requirement that the defendant/appellant purchase a Transcript of proceedings privately from the trial court reporter, at a cost set by the trial court, and under rules as to transcription and computation of cost which are unavailable to the general public or attorneys at large. The cost is so excessive that the ordinary appellant must necessarily limit the testimony at trial so he can pay for the Transcript if he should be convicted. Thus, justice is not administered freely, but must be purchased from the trial court through its appointed court reporter.

Appellant's Br. p. 28. He further claims that his rights were impaired by this court's refusal to order the court reporter to prepare the remaining portions of the transcript.

Our appellate rules provide that the record on appeal includes all proceedings before the trial court, regardless of whether they are transcribed. Ind. Appellate Rule 27. The rules further require that a party "*must* make satisfactory arrangements with the court reporter for payment of the cost of the transcript." App. R. 9(H) (emphasis added). It is clear to us that the court reporter and Wright had difficulty agreeing on payment arrangements for the original transcript and the supplemental transcript sought by Wright. Wright admits in his brief that his counsel met with the court reporter regarding the transcription of the omitted portions of the proceedings to "discuss whether to limit the Supplemental Transcript in light of the exorbitant cost." Appellant's Br. 29. Wright argues in his brief that the supplemental transcript would have cost approximately $1000 and that the "cost therefore prevents the appeal." Appellant's Br. 29. Those statements indicate that the court reporter did not flatly refuse to transcribe the additional portions as Wright suggests, but only that she refused to do so without additional compensation.

Wright claims that Appellate Rule 9(H) requiring parties to make satisfactory arrangements with court reporters is unconstitutional. He references the Indiana Constitution as follows:

> All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

Ind. Const. Art. 1, § 12. Apparently he contends that the setting of "excessive" rates for transcription interferes with his rights under this section. We are not persuaded by this allegation.

"Indiana Administrative Rule 15 provides that any Indiana trial court may adopt one of three model options to provide transcript preparation services to litigants. Since this case arose in the Marion Superior Court, the transcript was apparently prepared under Model Option One, which establishes the rate to be charged for normal, expedited and same day transcription services. (November 25, 1998 Marion County Order and Supreme Court Order approving same, Case No. 49S00–9812–MS–817). The approval of this rate by the Supreme Court of Indiana serves to protect litigants from excessive charges. In this regard, it is important to remember that Model Option One transcript services will normally be rendered outside of the court reporter's normal working hours. This usually makes transcript preparation "mandatory overtime" and court reporters should be able to expect compensation that reflects this fact. While we are cognizant that the cost of transcript preparation can be high, we cannot conclude that the cost infringes upon a defendant's right to appeal."

Furthermore, criminal defendants in Indiana who cannot afford to pay for a transcript are still entitled to one if they are found to be indigent. Justice DeBruler once remarked that "[f]rom the date of its admission to the Union down to this day, Indiana has been a leader in providing indigent persons with free access to her courts and in providing them with fair treatment while in court." *Thompson v. Thompson,* 259 Ind. 266, 273, 286 N.E.2d 657, 661 (1972). This notion is echoed by the statute providing that indigent defendants in criminal cases are entitled to a transcript:

> An indigent person desiring to appeal to the supreme court or the court of appeals from the decision of any circuit court or criminal court in criminal cases, and not having sufficient means to pro-

cure the longhand manuscript or transcript of the evidence taken in shorthand, by the order or permission of any court, the court shall direct the shorthand reporter to transcribe the shorthand notes of evidence into longhand, as soon as practicable, and deliver the same to the indigent person. However, the court must be satisfied that the indigent person has not sufficient means to pay the reporter for making the longhand manuscript or transcript of evidence, and the reporter may charge such compensation as is allowed by law in such cases for making and furnishing a longhand manuscript, which service of the reporter shall be paid by the court out of the proper county treasury.

Ind.Code § 33–1–4–1. Wright never claimed to be indigent and was, therefore, not entitled to receive a free transcript.

Wright also claims that the court reporter's failure to transcribe certain portions of the record, and this court's subsequent refusal to order her to do so, deprives him of his right to appeal. As the court reporter stated in the "Court Reporter's Response to Defendant's Verified Motion to Compel Reporter to Prepare Omitted Portions of Transcripts," it is standard practice in some areas of the state for reporters to omit voir dire and opening and closing statements from the transcripts unless specifically requested in the Notice of Appeal. The readily apparent reason for this practice is that those portions of the proceedings are frequently lengthy and are typically not the basis for issues on appeal. The omission of those portions thus saves most litigants hundreds, if not thousands, of dollars with respect to the preparation cost of the transcript. Those litigants who wish to raise issues requiring those portions of the proceedings are free to specifically request that they be transcribed. In other words, no litigant is deprived of the opportunity to raise issues

contained therein if the proper procedure for requesting the transcription is followed. Thus, the court reporter's failure to transcribe those portions was reasonable and did not infringe upon Wright's constitutional right to appeal.

 Our denial of Wright's "Verified Motion for Order Compelling Trial Court Reporter to Prepare, Certify and File Omitted Portions of Transcript, Compelling Compliance with Appellate Rule 28, and Setting Fees" was likewise reasonable. In the motion, he alleged that the matters not transcribed were "directly relevant to issues on appeal." Motion p. 3. He stated:

> [T]he State argued that the only proof of intoxication required on a public intoxication charge is that the defendant had been drinking alcohol, which supports Defendant's argument on appeal that the criminal statute is unconstitutionally vague and overly broad. Defendant will request the Court of Appeals to review numerous such matters argued to the jury, and will be denied a full and fair adjudication of the issues on appeals, unless the Court Reporter is compelled to transcribe the entire trial proceedings heard by the jury.

Motion p. 3. The allegation of error contained in the motion, even if assumed to be true, did not amount to reversible error because the jury was specifically instructed on the elements of the crime, including the definition of intoxication. Therefore, any inaccuracy in the State's argument with respect to the evidence required to find Wright guilty would have been harmless error, at best. Although generally averring to "numerous such matters," Wright failed to articulate any other errors contained in the untranscribed proceedings. We understand that without the transcript, Wright may have been unable to set forth those errors in great detail,

but a minimal identification of the errors was necessary for us to justify the delay and expense of ordering the court reporter to transcribe the additional portions. Wright had the option of specifically requesting those portions in the Notice of Appeal and yet did not do so. He failed to present a persuasive basis for us to order the court reporter to do so after the fact, particularly when there were questions about payment. Wright's contention that he was not aware of the standard practice to omit those sections does not excuse his failure to do so given that all litigants, even pro se litigants without legal training, are required to follow procedural rules. *See Boczar v. Meridian Street Foundation*, 749 N.E.2d 87, 91–92 (Ind.Ct.App. 2001) (holding pro se litigants to the same standards of civility and professional courtesy where litigant received legal training but was "not currently in active practice as a litigator"); *Wright v. Elston*, 701 N.E.2d 1227, 1231 (Ind.Ct.App.1998) (reminding litigants that they are held to established rules of procedure), *trans. denied.*

### Conclusion

Wright was in a public place when he was arrested for purposes of the public intoxication statute. That statute is not unconstitutional on it face or as applied to Wright. The challenges Wright raises to the special deputy statute are without merit, and the evidence supports his conviction. Finally, his right to appeal was not infringed upon by the issues surrounding the preparation and cost of the transcript. We affirm the conviction in all respects.

Affirmed.

KIRSCH, J., and MATHIAS, J., concur.